JOHN CARLO, INC., Plaintiff,

v.

CORPS OF ENGINEERS OF the UNITED STATES ARMY, FORT WORTH DIVISION; Donald J. Paladeno, C. E.; and the Secretary of the United States Army, Defendants,

and

Servidone Construction Corporation, Defendant-Intervenor.

Civ. A. No. 3–81–1800–H.

United States District Court,
N. D. Texas,
Dallas Division.

May 18, 1982.

Bowman S. Garrett, Jr., Luther P. Cochrane, Griffin, Cochrane & Marshall, Atlanta, Ga., for plaintiff.

Stafford Hutchinson, Asst. U. S. Atty., Dallas, Tex., for defendants.

Alan H. Kent, Schnader, Harrison, Segal & Lewis, Washington, D. C., Charles P. Storey, Frederick W. Addison, III, Storey, Armstrong, Steger & Martin, Dallas, Tex., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

This matter is before the Court on Defendants' Motion to Dissolve the current preliminary injunction. Plaintiff John Carlo, Incorporated filed its original complaint in this matter October 2, 1981; a conference was held and a temporary restraining order issued October 5, 1981. A preliminary injunction was entered October 8, 1981, pursuant to an agreement which provided that:

> The parties ... shall hereby be restrained and enjoined from issuing a Notice to Proceed and from initiating any

performance under the Contract at issue in this litigation until such time as the Office of the Comptroller General of the United States issues its decision on Plaintiff's bid protest, and thereafter until further order of the Court . . . .

The Comptroller General's decision was issued March 2, 1982, and filed with the Court March 5, 1982; Carlo's request to the GAO to reconsider its decision was denied March 31, 1982. Pursuant to the terms of the agreed preliminary injunction Intervenor Servidone Construction Corporation filed a motion to dissolve the preliminary injunction March 11, 1982. The government joined in that motion on April 6, 1982, and the matter was set for hearing on April 23, 1982.

The present suit arises from the solicitation and award of the Lakeview Lake Embankment Project[1] to Servidone Construction Corporation, intervenor in this suit. The specifications for the Corps of Engineers' project were released July 1, 1981, and bids were opened August 12, 1981. Carlo was the low bidder with Servidone the second low bidder. As a result of the pre-award survey undertaken by the Corps of Engineers' contracting officer to confirm the bid and to ascertain whether or not Carlo was a responsible contractor as required by law, see DAR 1–904.1 (1976 ed.), the Corps concluded that Carlo's association with Paul A. Bosco and Sons Contracting

Company prevented the Corps from awarding the contract to Carlo.

█ Prior to the award of a government contract the contracting officer must make an "affirmative determination that the prospective contractor is responsible within the meaning of 1–902." See DAR 1–904.1[2]. In making his determination of responsibility the contracting officer is required to consider the records of any affiliated or associated concerns who may influence the bidder's performance of the proposed enterprise, see *John Carlo, Inc.*, B–204928, March 2, 1982, citing *Air Unlimited*, B–189428, October 13, 1977, 77–2 CPD ¶ 294; and *Hydromatics International Corp.*, B–190669, July 29, 1974, 74–2 CPD ¶ 66, including subcontractors, see DAR 1–906.[3] Based on the information he had gathered in the pre-award survey the contracting officer determined Bosco lacked a satisfactory record of integrity and because of Carlo's association with Bosco the contracting officer further concluded Bosco's lack of integrity should be imputed to Carlo. It was on this basis the contracting officer concluded that he "could not make the affirmative determination required by DAR 1–902 concerning Carlo's integrity." See "Report and Recommendation of the Contracting Officer," ¶¶ 6 & 7 (submitted to the GAO October 26, 1981) [hereinafter "Report"]. For purposes of this suit Carlo concedes the contracting officer's determination regarding Bosco's

---

1. The Fort Worth Division of the Army Corps of Engineers on July 1, 1981, issued Invitation No. DACW63–81–B–0093 entitled Lakeview Lake, Mountain Creek, Texas: Specifications for Completion of Embankment, Spillway, and Outlet Works.

2. DAR 1–902 General Policy. Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only. A responsible prospective contractor is one which meets the standards set forth in 1–903.1 and 1–903.2, and such special standards as may be prescribed in accordance with 1–903.3 and by overseas commanders. The award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional procurement or administrative costs. While it is important that Government purchases be made at the lowest price, this does not require

an award to a supplier solely because he submits the lowest bid or offer. *A prospective contractor must demonstrate affirmatively his responsibility, including, when necessary, that of his proposed subcontractors. The contracting officer shall make a determination of nonresponsibility if, after compliance with 1–905 and 1–906, the information thus obtained does not indicate clearly that the prospective contractor is responsible.* (emphasis added)

3. DAR 1–906 Subcontractor Responsibility.

(b) Notwithstanding the general responsibility of a prospective contractor to demonstrate the responsibility of his prospective subcontractors, it may be in the Government's best interest to make a direct determination of the responsibility of one or more prospective subcontractors prior to award of the prime contract.

integrity, but Carlo disputes any finding by the contracting officer that the evidence of Carlo's and Bosco's relationship warrants imputing Bosco's lack of integrity to Carlo, rendering Carlo ineligible to receive the Lakeview contract.

The Corps first became aware that Bosco might be involved with Carlo in the Lakeview Project on August 26, 1981. In the course of completing the pre-award survey the Chief of the Fort Worth District's Procurement and Supply Division telephoned the Vice-President of Carlo and in the course of that telephone conversation the Vice-President revealed Carlo was considering using Bosco as a manager or subcontractor on the project.[4] See "Submission by the Army Corps of Engineers to the U. S. General Accounting Office," Exhibit F [hereinafter "Corps' Submission"].

In addition to this phone call the Corps received evidence of a Carlo-Bosco association from within the agency:

On or about 27 August 1981 the Contracting Officer was verbally advised that an investigation was ongoing in the Nashville District, U. S. Army Corps of Engineers, which might have an effect on a contract award under subject invitation. A telephone request for this information was made to the Nashville District. During this telephonic conversation between Bob Wallace, an Army CID investigator in Nashville, and Albert Proctor, District Counsel in Fort Worth, Mr. Wallace stated that several former or present employees of Paul A. Bosco or his company were stating that Paul Bosco or his company were about to receive a large contract with the Fort Worth District. Mr. Wallace also stated that the investigation in Nashville disclosed a course of dealing between John Carlo and Paul Bosco in which Paul Bosco bid and performed work in the name of John Carlo ([Corps' Submission] Exhibit G). Further information was requested to be provided in writing at a later date.

A review of Fort Worth's procurement files on which bids had been opened but on which awards had not been made did not disclose any invitation for bids on which Paul A. Bosco or his company was low bidder. A review of the file on this invitation revealed that John Carlo, Inc., had neither asked for nor received bidding documents. Paul A. Bosco & Sons Contracting Co. and B and V Construction Co. did receive bidding documents. ([Corps' Submission] Exhibit H).

"Report," ¶¶ 6 & 7. The contracting officer received the requested information on September 12, 1981. See "Corps' Submission," Exhibit L.

Finally, the Corps was made aware Carlo's Lakeview Project bid had been prepared and submitted on behalf of Carlo by Bosco. The first inkling the Corps had that Carlo had not prepared the bid came when it compared the bid and Carlo's bid verification: the signatures of Carlo J. Catenacci, President of John Carlo, Inc. on the documents did not match. Compare "Corps' Submission", Exhibits C & E. On August 31, 1981, the contracting officer on the Lakeview project requested Carlo explain the apparent discrepancy in signatures. See "Corps' Submission", Exhibit I. In response to this request Carlo forwarded to the Corps a letter, dated September 8, 1981, indicating its intent to be bound by Bosco's bid and to perform the contract. See "Corps' Submission", Exhibit J. The Corps requested further proof that Bosco's bid actually bound Carlo at the time it was submitted. The proof presented by Carlo was in the form of a document entitled "Unanimous Consent of Board of Directors of John Carlo, Inc. In Lieu of Meeting," dated June 17, 1980. See "Corps' Submission", Exhibit K. The corporate resolution, received by the Corps on September 11, 1981, established Bosco's authority to "sign

---

4. "Called M. McElroy about pre-award survey data. He was in Texas .... I asked if the firm had ever built a dam. He replied that they had done a lot of dirt work but had not done an embankment. I asked how they proposed to do the work. He said they were evaluating that now. I pressed for what they were thinking. He said they were dealing with Paul Bosco and Sons and probably use them in a management or subcontract role."

and submit bids on behalf of this Corporation, either as agent for this Corporation or by affixing the name of Carlo J. Catenacci, President ...." *Id.* The corporate resolution expressly stated it was intended to be retroactive. *Id.*

The letter dated September 18, 1981, *see* "Corps' Submission", Exhibit N, sent to Carlo notifying it of the contracting officer's determination of nonresponsibility was immediately followed by Carlo's notice of bid protest, dated September 24, 1981[5] and received September 25, 1981. Carlo J. Catenacci, President of John Carlo, Inc. also called the contracting officer on September 25, 1981, to discuss the determination of nonresponsibility. The contracting officer's memorandum of that conversation states:

> Mr. Carlo indicated that he understood the contents of the letter [dated September 18, 1981], but nevertheless wanted the job. He felt he could disassociate himself from Bosco and present an acceptable plan which would allow the award to be made. He requested an opportunity to negotiate with us toward that end.

"Corps' Submission", Exhibit P. The contract officer informed Catenacci that given the unique circumstances of the case any negotiations of this type would have to be carried on directly with the Judge Advocate General's office. *Id.*

Pursuant to DAR § 2–407.8(b)(3) (1976 ed.) the contracting officer requested authority to make an award of the Lakeview Lake contract notwithstanding the pending bid protest. The request was filed September 28, 1981, granted September 30, 1981, and an award of the Lakeview Embankment Project was made to Servidone. The basis for the expedited award is described in the GAO's decision:

On September 28, 1981, authority to award the contract notwithstanding this protest was requested pursuant to the Defense Acquisition Regulation (DAR) § 2–407.8(b)(3) (1976 ed.) as advantageous to the Government because bids would expire in 2 weeks, the onset of the raining season would preclude use of borrow material from a low-lying area and the award of other contracts was premised on the timely award of this contract.

*John Carlo, Inc., supra.* Carlo then filed this action.

■■■■ The issue before the Court at this time is whether to continue or dissolve the outstanding preliminary injunction. While the general criteria governing the grant of a preliminary injunction by the district court are, of course, well known,[6] *see Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1266 (5th Cir. 1978), *citing Compact Van Equipment Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978), the Court is mindful of the special considerations governing the "grant or denial of a disappointed bidder's motion for a preliminary injunction against the award of a government contract." *See Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016 at 1022 (3d Cir. 1982), *citing Allis-Chalmers Corp. v. Friedkin,* 635 F.2d 248 (3d Cir. 1980); *Sea-Land Services, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir. 1979); and *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971); *accord Kinnett Dairies, Inc.,* 580 F.2d at 1270–1271. In cases of government procurement contracts the Court in exercising its discretion to grant or deny injunctive relief is guided by these special considerations:

> the practical considerations of efficient procurement of supplies for continuing

---

**5.** Carlo claims it did not receive the September 18, 1981, letter until September 25, 1981.

**6.** In order to keep the agreed preliminary injunction in effect, Plaintiff John Carlo, Inc. must satisfy the following four prerequisites of injunctive relief. "These are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the

injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest." *Compact Van Equipment Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d at 954.

government operations; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through adherence to statutes and regulations. *Princeton Combustion Research Laboratories, Inc., supra,* 674 F.2d at 1022; *citing Sea-Land Services, Inc. v. Brown,* 600 F.2d at 434; *accord Allis-Chalmers Corp. v. Friedkin,* 635 F.2d at 253. In addition to these special factors the Court is also mindful of the overriding concern in cases of this type: avoidance of disruptions in the procurement process absent a clear need for judicial intervention. *See Kinnett Dairies, Inc.,* 580 F.2d at 1270–1271, *citing Hayes International Corp. v. McLucas,* 509 F.2d 247, 258 (5th Cir. 1975). These are the principles which have guided the Court's decision.

In its protest to the GAO and now before this Court Carlo attacks the contracting officer's determination of nonresponsibility on three grounds: (1) the contracting officer's actions violated constitutional due process; (2) the evidence in the record is insufficient to sustain any finding of an association between Carlo and Bosco warranting the imputation of Bosco's lack of integrity to Carlo; and (3) the contracting officer's actions violated accepted agency practice. The Court, having thoroughly reviewed the record and applicable case law, is of the opinion there is little likelihood Carlo will be able to prevail on the merits of its claims.

█ Absent a showing of an actual or de facto debarment the Army Corps of Engineers was under no statutory, regulatory or constitutional obligation to notify Carlo of the adverse findings of the pre-award survey and provide him an opportunity to respond. *See Conset Corp. v. Community Services Administration,* 655 F.2d 1291, 1297 (D.C.Cir.1981), *citing Old Dominion Diary Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 956 (D.C.Cir.1980); *accord Blackhawk Heating & Plumbing Co. v. Driver,* 297 F.Supp. 1295, 1299–1300 (D.D.C. 1969). There is no claim the Corps' actions constituted an actual debarment, and thus the issue before the Court is whether or not the Corps' actions can be characterized as a de facto debarment. *See Conset,* 655 F.2d at 1297.

█ A finding of nonresponsibility does not constitute a de facto debarment unless the contracting officer's decision was "effectively used to bar" Carlo from any further government contract work. *Id.* In order to determine if Carlo has been effectively barred from government contract work the Court must look at a number of factors: (1) were other persons or governmental agencies apprised of the contracting officer's finding of nonresponsibility; (2) was the information circulated for the purpose of preventing Carlo from securing future contracts with the government; (3) did circulation of the information in fact stigmatize Carlo; and (4) has Carlo suffered any losses in government business attributable to the contracting officer's determination of nonresponsibility in the Lakeview Project. *Id.* at 1291.

If these issues are resolved in favor of Carlo and the actions of the Corps are found to constitute a de facto debarment, the Corps' failure to notify Carlo of its adverse finding and its failure to allow Carlo to respond prior to any subsequent denials may constitute a violation of constitutional due process. But at this time there is absolutely no evidence to show this has occurred. During the preliminary injunction hearing April 23, 1982, Carlo adduced no evidence in support of its claim of de facto debarment; to the contrary, the Corps presented unrebutted testimony that the Corps' determination of nonresponsibility had not adversely affected Carlo's ability to seek or secure government contracts. In addition, the Court would note that the potential stigmatizing effect of the Corps' finding of nonresponsibility must be assessed in light of the unique circumstances of this case. The basis for the finding, Carlo's association with Bosco, can be rectified and any potential taint expunged by clarifying their relationship, if any, in future contract bids. The Court recognizes that claims of de facto debarment may have

merit, but the Court seriously questions the merits of Carlo's claim in this action.

■ With regard to Carlo's claim that there is an inadequate evidentiary basis for the contracting officer's determination of nonresponsibility, as well as its claim that the contracting officer failed to adhere to accepted agency practice in making his determination of nonresponsibility, the Fifth Circuit has made it clear that "those challenging the legality of procurement decisions

> bear a heavy burden of showing either that (1) the procurement official's decision on matters committed primarily to his own discretion had no rational basis; or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

[*Kinnett Dairies, Inc.*] 580 F.2d at 1271, quoting *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)." *See Bayou State Security Services, Inc. v. Dravo Utility Constructors Inc.,* 674 F.2d 325 at 329 (5th Cir. 1982); *accord Princeton Combustion Research Laboratories, Inc., supra,* at 5. In this matter the primary test for determining whether or not the contracting officer's actions were illegal is the rational basis test. *Cf. John Carlo, Inc.,* B–204928, March 2, 1982, *citing West Electronics, Inc.,* B–190173, February 10, 1978, 78–1 CPD ¶ 118 ("The evaluation of what constitutes a clear indication of responsibility is essentially a business judgment involving considerable discretion on the part of the contracting officer."); *Pope, Evans and Robbins, Inc.,* B–200265, July 14, 1981, 81–2 CPD ¶ 29; *RIOCAR,* B–180361, May 23, 1974, 74–1 CPD ¶ 282 ("[A] . . . judgment [of nonresponsibility] should of course be based on fact and reached in good faith; however, it is only proper that it be left largely to the sound administrative discretion of the contracting officers involved . . . ."); *accord*

*Venice Maid Co. v. United States,* 639 F.2d 690, 698 (Ct.Cl.1980); *Tidewater Management Services, Inc. v. United States,* 573 F.2d 65, 73 (Ct.Cl.1978); *Keco Industries v. United States,* 492 F.2d 1200, 1205 (Ct.Cl. 1974); *Warren Brothers Roads Co. v. United States,* 355 F.2d 612, 615, 173 Ct.Cl. 714 (1965).

The primary issue before the Court is whether or not the contracting officer had a rational basis for his decision to impute Bosco's lack of integrity to Carlo. The GAO in its opinion set forth the general rule governing imputation.

> [T]he lack of integrity of officers, employees, or other associates has properly been imputed to a bidder when it appears that *significant influence might be exercised in the proposed enterprise.* (emphasis added).

*John Carlo, Inc., supra, citing Air Unlimited, supra; Hydromatics International Corporation, supra; Thompson Manufacturing Company, Inc.,* 50 Comp.Gen. 360 (1970); *Domco Chemical Corp.,* 48 Comp.Gen. 769 (1960); *cf.* DAR 1–906 (these regulations authorize the determination of a prime contractor's responsibility on the basis of its subcontractor's).[7]

The GAO after its review of the record denied Carlo's bid protest:

> [O]n the basis of this documentary evidence we cannot say that the contracting officer lacked a reasonable basis for the determination of nonresponsibility of Carlo. *See* 50 Comp.Gen. 360, *supra,* where the lack of integrity of the individuals who controlled the activities, policies and management of the bidding corporation was imputed to that corporation. Here, the record indicates that Bosco had unlimited power to bind Carlo to contract and was to manage or perform the work as a subcontractor.

**7.** "In an affirmative determination of responsibility case turning on the experience required of a contractor in order to perform the contract, the Comptroller General has upheld evaluating a proposed subcontractor, even where no notice was given in the solicitation that such evaluation would be made. *Contra Costa Electric, Inc.,* B–200660, March 16, 1981, 81–1 CPD ¶ 196. Therefore, the Government has authority under DAR 1–906 to determine John Carlo, Inc. to be nonresponsible solely on the basis of John Carlo's proposal to use Bosco as a subcontractor." "Report," at ¶ 7.

*John Carlo, Inc., supra.* The GAO's decision, though not binding on this Court, is due substantial deference. *See Bayou State Security Services, supra,* 674 F.2d at 327 n.1, *citing Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316 (D.C.Cir.1971); *accord Kinnett Dairies, Inc.,* 580 F.2d at 1272; *Hayes,* 509 F.2d at 258.

Carlo claims that there can be no imputation of Bosco's lack of integrity to Carlo absent clear and convincing evidence of a binding obligation or commitment on the part of Carlo to use Bosco in performing the Lakeview Lake Project. Carlo further claims that absent such evidence the Corps must base its imputation of Bosco's lack of integrity to Carlo solely on the absence or presence of interlocking corporate structures. The contracting officer may be so constrained in circumstances in which the prime contractor and alleged affiliate lack any significant prior association, but that is not the case here. The evidence of the record clearly indicates a prior association between Carlo and Bosco during which Bosco bid contracts in Carlo's name and subsequently performed on those contracts. The duration and terms of that association are relevant in determining Carlo's responsibility relative to the Lakeview Project. *See Air Unlimited, supra; Hydromatics International Corp., supra; Thompson Manufacturing Company, Inc., supra; Domco, supra.*

*Thompson Manufacturing Company, Inc.,* cited by both the contracting officer and the GAO in their reports, clarifies the relevance of prior affiliations or associations in subsequent determinations of nonresponsibility. Here, as in *Thompson Manufacturing,* there is alleged to have been a change in Carlo's operations sufficient to warrant ignoring the pre-existing Carlo-Bosco association and negating any imputation of lack of integrity from Bosco to Carlo on the basis of the evidence in the record. In *Thompson Manufacturing* the bid protester contended that the "prior unsatisfactory performance by its predecessor company . . . should not now be imputed to them personally or to the newly organized corporate entity because of the limited extent to which [the new company's current owners

had] participated in the actual management and operation of [the prior company]." *Thompson Manufacturing Company, Inc., supra.* The GAO's response to the protester's claim is enlightening.

Here, there is alleged to have been a nearly complete change in operating management of the business entity concerned. We think the basic question involved in such a situation, so far as the imputation of past delinquencies to the new management is concerned, is whether or not the new operating managers have demonstrated sufficient tenacity and perserverance since their assumption of management responsibilities to create confidence in their present ability to perform the proposed contract in a satisfactory manner.

It seems clear that prior delinquencies of any business entity should not be imputed to it after it is acquired by persons who had no prior connection with its management.

Where there has been no change in higher corporate control, or where the same higher management controls both the old and the revamped business entity, we believe it is proper to require demonstration of adequate tenacity and perserverance by the new operating management to show that prior deficiencies in these areas have been cured.

*Thompson Manufacturing Company, Inc., supra.*

As the GAO made clear in its review of Carlo's bid protest, the claim that, absent actual evidence Bosco would perform or control the Lakeview contract, the contracting officer's determination of nonresponsibility is erroneous is too narrow a statement of applicable procurement law.

While Carlo argues that the agency under the power of attorney was, as a matter of law, a limited power of attorney to prepare and submit bids only and created no agency or employment beyond that, we believe it evidences a longstanding relationship between Bosco and Carlo which the contracting officer could consider in

making his responsibility determination. We note that the power of attorney empowers Bosco to determine costs and profit and to bind Carlo to a contract, with no requirement that Bosco confer with Carlo either before or at anytime during the preparation of a bid. Bosco is, therefore, empowered to bind Carlo to contracts at Bosco's sole discretion. Apparently, Bosco had been performing in this manner for some time prior to execution of the power of attorney since the power of attorney is made retroactive and prior actions of Bosco are expressly ratified and affirmed.

*John Carlo, Inc., supra; accord Thompson Manufacturing Co., Inc., supra; Air Unlimited, supra; Hydromatics International Corp., supra; Domco Chemical Corp., supra.*

At the time of his decision the contracting officer had before him the following evidence of an association between Carlo and Bosco which enabled Bosco to influence Carlo both in the preparation of bids and performance of its government contracts.

1. The Titsworth Memorandum documenting the August 26, 1981, telephone conversation between Carlo's Vice-President, McElroy and the Fort Worth District's Chief of Procurement. *See* "Corps' Submission", Exhibit F.[8]

2. The written reports of the investigation undertaken by the Army Corps of Engineers, Nashville District, *see* "Corps' Submission", Exhibits G & L, establishing a prior "course of dealing between John Carlo and Paul Bosco in which Paul Bosco bid and performed work in the name of John Carlo." *See* "Report", ¶ 6.

3. The Lakeview Lake Project bid prepared by Bosco, Carlo's letter of September 8, 1981, and a copy of the corporate resolution of June 17, 1980, all of which indicate Bosco had complete authority to bid on projects in Carlo's name. *See* "Corps' Submission", Exhibits C, J and K.

It is clear from this evidence that Carlo's prior association with Bosco is as relevant as their current association, *i.e.*, Bosco's bidding the contract for Carlo and Carlo's proposed use of Bosco, and was considered by the contracting officer along with the other evidence in the record in determining whether or not Carlo is currently a responsible contractor. *See* "Report", ¶ 4.

In addition to the evidence available to the contracting officer when he made his initial determination, at the time of the bid protest the contracting officer and the GAO also had before them the Palladino Memorandum which states:

On Friday afternoon, 25 Sept., I was called by Mr. Carlo Catenacci (John Carlo) concerning the embankment contract for Lakeview. Mr. Carlo had received our letter notifying him that we had determined John Carlo, Inc. to be nonresponsible and hence did not intend to award the contract to him.

Mr. Carlo indicated that he understood the contents of the letter, but nevertheless wanted the job. He felt he could disassociate himself from Bosco and present an acceptable plan which would allow the award to be made. *He requested an opportunity to negotiate with us toward that end.* (emphasis added).

"Corps' Submission", Exhibit P. The contracting officer treated this offer to negotiate a severance between Carlo and Bosco as further evidence of their continuing association.[9] The GAO in its opinion commented on this as follows:

---

8. "Carlo has furnished an affidavit by the vice president, which states that the possible involvement of Bosco was first raised by the Chief of the Procurement and Supply Division, not by the vice president, and that no commitment had been made by Carlo to use Bosco. Where the only evidence with respect to a disputed question of fact consists of contradictory assertions by the protester and the agency, the protester has failed to carry the burden of affirmatively proving its allegation. *NGC In-*

*vestment & Development Corporation d/b/a Neiman Glass & Paint*, B-194523m August 2, 1979, 79–2 CPD 76." *John Carlo, Inc., supra.*

9. "On 25 Sept. 1981 the president of John Carlo, Inc. called the Contracting Officer offering to negotiate into an acceptable position of responsibility by attempting to disassociate John Carlo, Inc. from Bosco. This offer was declined (Exhibit P)." "Report," ¶ 16. Carlo has submitted an affidavit from the president of

We note that Carlo did not come forward between the time of the phone conversation regarding the pre-award survey [*see* the Titsworth Memorandum] and the determination of nonresponsibility to offer any firm other than Bosco to assist in the performance of the contract. The only name of a possible subcontractor or manager the contracting officer had before him in the time frame was Bosco.

*John Carlo, Inc., supra.*

■ At this stage in the proceedings the Court must determine whether or not there is a substantial likelihood Carlo will ultimately prevail on the merits of its claim. The Court is of the opinion that, contrary to Carlo's claim, the absence of direct evidence Carlo was committed or obligated to use Bosco in performing the Lakeview contract is not a sufficient basis upon which to reverse the contracting officer's determination.

The contracting officer's determination that the association between Carlo and Bosco warranted imputing Bosco's lack of integrity to Carlo appears to have had a reasonable basis. In reaching his decision the contracting officer correctly relied both on the evidence of their present association as well as evidence of their past association and on the basis of the entire record made his determination.[10] After reviewing the evidence in the record and the case law cited by the contracting officer in his report and the GAO in its decision denying Carlo's

bid protest, the Court finds of questionable merit Carlo's claim that the contracting officer's determination lacked a rational basis.

■ Carlo further claims the contracting officer's violations of accepted agency practice warrant judicial intervention.[11] The contracting officer is alleged to have violated agency practice as follows: (1) the contracting officer failed to use the evidentiary standard of clear and convincing evidence in making his determination of nonresponsibility; (2) the contracting officer had an affirmative duty to notify Carlo of the adverse pre-award survey and to secure additional information to confirm the current status of Carlo's association with Bosco prior to making his determination, which he failed to do; and (3) the contracting officer had a duty to negotiate a withdrawal of the determination of nonresponsibility with Carlo prior to the award of the Lakeview contract.

The Court has reviewed the record and the case law and finds little basis for Carlo's claim that the contracting officer's actions in anyway violated accepted agency practice. The Court also notes that the GAO in its decision denying Carlo's bid protest affirmed the contracting officer's determination as reasonable and in compliance with accepted agency practice. *See Kinnett Dairies, Inc.,* 580 F.2d at 1272; *Hayes,* 509 F.2d at 258.

John Carlo, Inc., Mr. Catenacci, which states: "I made it clear to Colonel Palladino that there was no existing or contemplated obligations or commitment to use Bosco in any capacity on the Project . . . ." Exhibit 16 of Plaintiff's Motion for Summary Judgment. As indicated in footnote 8, *supra,* conflicting affidavits are not a sufficient basis for overturning an agency decision.

10. *See* Court Order, filed May 17, 1981 (Court's ruling on Carlo's motion in limine attempting to limit use of the "Corps' Submission", Exhibits G & L.)

11. Carlo correctly states the rule that deference is due an agency's actions which adhere to "accepted agency practice," *see Kinnett Dairies, Inc.,* 580 F.2d at 1271, *citing Hayes,* 509 F.2d at 258, but Carlo may overstate the corollary. According to Carlo failure to adhere to

accepted agency practice is tantamount to a "clear and prejudicial violation of applicable statutes or regulations" or in the alternative, failure to adhere to accepted agency practice renders a decision "irrational" as a matter of law, *see Kinnett Dairies, Inc.,* 580 F.2d at 1271, *citing Kentron Hawaii,* 480 F.2d at 1169, in either case judicial intervention is required. As will be seen below the Court need not decide at this time which prong of the *Kinnett-Kentron* test would apply if the agency were found to have violated accepted agency practice. *Cf. Princeton Combustion Research Laboratories, Inc., supra,* 674 F.2d at 1022, (Agency action, even action allegedly failing to conform to agency practice or guidelines, is only subject to judicial scrutiny under the rational basis test); *accord, Keco Industries, Inc. v. United States,* 428 F.2d at 1233.

The GAO in his review of the determination of nonresponsibility found no violation of agency practice in the contracting officer's failure to use the evidentiary standard of "clear and convincing" evidence. To the contrary, the GAO's outline of the applicable law makes it clear that it is the bidder who bears the burden of presenting "clear" evidence of responsibility to the contracting officer, not vice versa:

> Before the award of a contract, the contracting officer must make an affirmative determination that the prospective contractor is responsible. DAR § 1–904.1 (1976 ed.). If the information available to the contracting officer "does not indicate clearly that the prospective contractor is responsible," a determination of nonresponsibility is required. DAR § 1–902 (1976 ed.). *Mayfair Construction Company*, B–192023, September 11, 1978, 78–2 CPD ¶ 187; *West Electronics, Inc.*, B–190173, February 10, 1978, 78–1 CPD ¶ 118.

*John Carlo, Inc., supra.* As the GAO stated, the contracting officer's determination of nonresponsibility is left to his administrative discretion and will only be set aside upon a "clear showing of the lack of a reasonable basis for the finding." *Id.* This statement of agency practice by the GAO in *John Carlo, Inc.* is consistent with prior GAO decisions:

> This office has consistently taken the position that the question as to whether evidence of a bidder's lack of integrity is sufficient to warrant a finding in a particular case that a bidder is not responsible is a matter primarily for determination by the administrative officers concerned, and such determination will not be questioned by us in the absence of a clear showing of the lack of a reasonable basis therefor.

*Mayfair Construction Company*, B–192023, September 11, 1978, 78–2 CPD ¶ 187; *accord Tidewater Management Services, Inc.*, 573 F.2d at 74 ("There is no indication that . . . [the contracting officers] felt the need for more information; nor is there any objective evidence before the court to indicate that they were unreasonable or acted without basis in this decision. They cannot therefore be held to have abused *their wide discretion in concluding that they had sufficient information on which to make the award . . . .*" (emphasis added)); *Pope, Evans and Robbins, Inc., supra.*

Carlo's authority for the proposition that "clear and convincing" is the controlling evidentiary standard in making a determination of nonreasonability, *Pathman*, 43 Comp.Gen. 257, 261 (1963), *citing Kershaw*, 39 Comp.Gen. 868, 972 (1960), does not support this absolute rule. The GAO in *Pathman* made it clear that the "clear and convincing" evidence standard was a special standard applicable in a limited number of cases and that the standard to be applied in most cases is the substantial evidence or rational basis standard:

> It is well settled that the determination of a bidder's responsibility involves the exercise of a considerable range of discretion, and our office has consistently adhered to the rule that the administrative determination will not be questioned unless arbitrary, capricious or not based on substantial evidence.

*Pathman, supra*, at 258 ("The clear and convincing standard" is a "standard of proof which *may be necessary in a particular case.*" *Id.* at 261); *see also Gary Construction Company, Inc.*, B–181751, December 17, 1974, 74–2 CPD ¶ 357 (The GAO has interpreted the "substantial evidence" test to mean "the evidence of record reasonably provides a basis for such determination . . . ."); *cf. Steadman v. Securities and Exchange Commission*, 450 U.S. 91, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981) (An analogous interpretation of the "substantial evidence" test under Section 10(e) of the Administrative Procedure Act.) Other than its allegations of de facto debarment, Carlo has failed to indicate why this special standard applies in the case currently before the Court.

With regard to the contracting officer's alleged obligation to give Carlo notice of the adverse pre-award survey, confirm the current status of the Carlo-Bosco associa-

tion, and negotiate a withdrawal of the adverse determination, neither party contends the applicable statutes or regulations impose these obligations on the contracting officer and the Court's previous discussion of Carlo's due process claims precludes that as a basis for imposing these duties. The only question left is to determine whether or not these actions of the contracting officer violated accepted agency practice.

The GAO's position on the question of *notice* is clear:

Concerning the allegation that the contracting officer had a duty to seek further information from Carlo or notify it of the negative information, we have held that there is no requirement for formal notice to a bidder before the issuance of a responsibility determination or the award of a contract to another bidder.

*John Carlo, Inc., supra.* The GAO's position is equally clear on the question of information gathering:

[A] contracting officer has no duty to independently gather additional information to resolve his/her doubts created by data already submitted.

*Pope, Evans and Robbins, Inc., supra.* The determination of nonresponsibility is a decision left to the discretion of the contracting officer and under normal agency practice the contracting officer's actions are not subject to scrutiny absent an abuse of discretion. *Id.* ("[W]e point out that it is within the contracting officer's discretion not to discuss negative pre-award survey findings with a prospective contractor before making a responsibility determination."); *accord RIOCAR, supra* (The contracting officer's failure to discuss the pre-award survey prior to issuance of his determination of nonresponsibility and his subsequent award of the contract to another bidder "does not appear to have been an improper exercise of the discretion granted him by regulation."); *Mayfair Construction Company, supra; Air Unlimited, supra; Gary Construction Company, Inc., supra.*

■ Although the contracting officer has broad discretion in developing and evaluating the evidentiary record, he has an affirmative duty to resolve "conflicting evidence" in that record and failure to do so may constitute an abuse of discretion. *See Lear Seigler,* 52 Comp.Gen. 977 (1973). Carlo claims the McElroy letter of September 8, 1981, *see* "Corps' Submission", Exhibit J., is "conflicting evidence" as defined in *Lear Seigler* and the contracting officer's failure to seek additional information confirming the current status of the Bosco-Carlo association in the face of this letter constituted a derogation of his duty and an abuse of discretion.

The Court is of the opinion *Lear Seigler* is inapplicable on these facts. In *Lear Seigler* the contracting officer "virtually" ignored a favorable pre-award survey in which he had participated and based his adverse determination solely on a second unfavorable report. *Id.* On those facts the GAO held the contracting officer had a duty to reconcile the directly conflicting evidence. The McElroy letter is simply not comparable to a favorable pre-award survey; it does not put the contracting officer on notice that his finding of an association between Carlo and Bosco sufficient to warrant imputing Bosco's lack of integrity to Carlo is highly questionable.

At the time the contracting officer received the letter from McElroy it was already on notice Carlo would seek assistance from other firms, probably Bosco, in performing the contract, *see* "Corps' Submission", Exhibit F, and nothing in the letter directly rebuts that information. The letter states Carlo is bound by the bid submitted by Bosco and intends to perform the contract, but this language is not inconsistent with a finding Carlo would use Bosco as a subcontractor. The Court is of the opinion that up until the time the contracting officer made his determination the record was devoid of any conflicting evidence as defined in *Lear Seigler.* The contracting officer in this case did not abuse his discretion in determining the evidentiary record was adequate and terminating the pre-award survey.

■ The question of negotiation is also left to the contracting officer's discretion.

Absent a clear showing that the basis for his determination of nonresponsibility has been thoroughly and unequivocally rectified, the contracting officer may terminate negotiations with a bidder and award the disputed contract to another. *See Dorsey, Owen Scott, Barber & Marquart*, 38 Comp. Gen. 468 (1958).[12] In *Dorsey* the low bidder's president and majority stockholder was determined to lack integrity and his lack of integrity was imputed to the corporation. The contracting officer and the bidder were in the midst of negotiations trying to work out an acceptable resolution when the contracting officer decided to award the contract to another bidder. In commenting on his actions the GAO noted that clear evidence of a complete severance of the relationship between the bidder and the employee-stockholder *"might have been sufficient to require a reevaluation of the nonresponsibility determination,"* but the GAO upheld the contracting officer's actions on the grounds he had the discretion to terminate negotiations when the only evidence before him that the problem had been satisfactorily resolved were proposed solutions or tentative plans. *Id.*

Carlo claims that the contracting officer had a duty to reevaluate his determination of nonresponsibility after he received the phone call on September 25 from Carlo Catenacci. Carlo overstates the significance of the Catenacci phone call. According to Carlo the call was unequivocal evidence that the relationship between Carlo and Bosco did not warrant imputing Bosco's lack of integrity to Carlo and thus, under either *Lear Seigler* or *Dorsey*, the contracting officer had a duty to negotiate. Con-

trary to Carlo's contention, the contracting officer's report to the GAO as well as his memorandum of the Catenacci call indicates he considered the call and offer to negotiate further corroboration of Carlo's and Bosco's relationship, not evidence their association had been terminated in a fashion requiring reconsideration of his determination under *Dorsey*. The *Lear Seigler* case involved evidence gathered prior to the determination of nonresponsibility and is distinguishable on that basis.

The question is whether or not the contracting officer abused his discretion in terminating the negotiations. Neither the contracting officer nor the GAO took the position that the information received from Carlo after the determination of nonresponsibility would not be considered. When the contracting officer received the phone call from Carlo Catenacci on September 25, 1981, the officer went to legal counsel in an attempt to clarify the agency's position. The contracting officer refused to negotiate directly with Catenacci, referring him to the Judge Advocate General's office, on the advice of counsel. The contracting officer's actions appear to comply with accepted agency practice and fall within the scope of his discretion.

Plaintiff not having established a substantial likelihood of success on the merits, the remaining elements of injunctive relief need not detain the Court long. *See Kinnett Dairies*, 580 F.2d at 1266; *accord Princeton Combustion Research Laboratories, Inc., supra*, 674 F.2d at 1022. Based on the evidence presented at the preliminary injunction hearing the Court finds the rela-

---

12. The *Dorsey* rule cited by Carlo is dicta and offers little clarification on the issue of a contracting officer's duty to reevaluate a determination of nonresponsibility. The other cases cited by Carlo are distinguishable on similar grounds. *See Harper Enterprises*, B-179026, January 25, 1974, 74-1 CPD ¶ 31 (The GAO found the contracting officer had erroneously failed to consider evidence of a joint venture established subsequent to bid opening but prior to the determination of nonresponsibility); *Swinehart Electric*, 51 Comp.Gen. 237 (1971) (The GAO held that a contracting officer may not make a determination of nonresponsibility

solely on the basis of allegations made by a bidder's competitors on the grounds the practice would undermine the integrity of the bidding process); *Filtron Company*, 50 Comp.Gen. 281 (1970) (Applying the substantial evidence standard the GAO found an inadequate factual record to support a determination of nonresponsibility where the only evidence was a recommendation solicited from another agency and the price differential between bidders; there is little dispute that the contracting officer's decision must be based on evidence in the record).

tive injury to the two contractors, John Carlo, Inc. and Servidone Construction Company, evenly balanced. Both Carlo and Servidone will suffer a loss of profits if they fail to secure the contract and it is clear neither will be able to recover these profits from the United States. *See Keco Industries, Inc. v. United States*, 428 F.2d 1233 (Ct.Cl.1970). Both Carlo and Servidone put on evidence at the hearing establishing the importance of the contract as a means of enabling them to move into the Texas construction market, establish a sound financial base and secure additional lucrative contracts. In addition to the losses normally expected to result from the loss of a large government works contract, Carlo and Servidone have also experienced a reduction in their bidding activities as a result of having outstanding performance bonds for the Lakeview contract which reduce their bonding capacity.

The Court has also considered the extensive testimony presented at the preliminary injunction hearing describing the harm to the government that continuance of the injunction poses. The Lakeview Project was originally authorized in 1965; the current completion date is 1988 and the total estimated cost of the project is $220 million. The government's evidence outlined the increase in costs it will incur if completion of the embankment work is delayed by this injunction. As rebuttal evidence Carlo submitted a bar graph, prepared in consultation with Bosco, reworking the construction schedule submitted by Carlo with its bid. If the graph is accurate it appears it would be possible to complete the project within the original schedule even if actual construction did not begin until Fall of 1982. Servidone attacked the reliability of the graph on cross-examination. Carlo also claims that the Corps by amending the contract specifications, making the completion date contingent upon the start date rather than having it fixed, had undermined any claim it might have that completion of the embankment project within the original time frame is crucial.

However, although the Court recognizes Carlo's right to be treated fairly by the government, and its right to request judicial intervention in the procurement process to protest unfair treatment, these rights must be balanced with Servidone's right to rely on the procurement and bidding process in preparing to perform the contract and the public's interest in an efficient cost effective procurement process. The Court after carefully considering the evidence is of the opinion Carlo has failed to prove that the threatened injury to it outweighs the injury to Servidone or the government which may be caused if the injunction is continued. In addition, the Court is of the opinion Carlo has failed to show that the continuation of the injunction would not be adverse to the public's interest.

Defendants' Motion to Dissolve is therefore GRANTED and the preliminary injunction entered October 8, 1981, is DISSOLVED.

SO ORDERED.